Scoeield, J.,
delivered the opinion of the court:
In the spring of 1876, while the government was organizing at Fort Lincoln, in Dakota Territory, a military expedition against hostile Indians, Lieutenant Nowland, acting quartermaster, was directed to hire forty teams to accompany the expedition. Claimant contracted to furnish and did furnish twenty-six, at $1.95 per day. It subsequently transpired that he was the owner of only four of these teams. For the other twenty-two he had subcontracted at $1 per day with other team-owners, who were also to be the drivers. As it was expected that the teams would be discharged some distance from home, it was further agreed that they should be allowed the daily pay for the return trip.
The train left Fort Lincoln about the middle-of May, 1876. Three of claimant’s teams, having given out on the way, were sent back. The other twenty-three continued with the troops until they arrived,'about the 1st of September, at the mouth of Glen-dive Creek, on the Yellowstone River. The mouth of this creek was at that time the head of steamboat navigation. A military post, with Lieutenant-Colonel Otis in command and Lieutenant Campbell as quartermaster, was there established. To the latter officer Lieutenant Nowland, the quartermaster who had accompanied the expedition, on September 5, 1876, turned over the teams and all the public stores. Thereupon the drivers and owners of the twenty -two teams, taking the position that their contract with claimant Avas ended, declined to perform any further service under it. Steamboats Avere at that time unloading supplies designed for a cantonment at Tongue River. The drivers, though urgently besought by both Otis and Campbell to load for that place, obstinately refused. They would no longer work for claimant. They proposed, however, each one on his own account, to hire to the government at $5 per day. *90 Lieutenant Campbell, in tlie belief that claimant was entitled to the profit on his contract for the ten days that would be consumed in returning to Fort Lincoln, promised the team-owners if they would make one trip to Tong’ue River he would endeavor to secure, upon their return, the acceptance of their proposal. With this understanding, they undertook the trip. During the absence of the teams, claimant arrived at Glendive. From Lieutenant-Colonel Otis he learned the position and determination of the teamsters. He did not propose to arrange with them nor furnish others in their stead. He suggested nothing and did nothing. After this interview, September 26,1876, by authority given him September 10, 1876, Lieutenant Campbell hired all the teams, including the one belonging to claimant, at $5 per day. From that time until November 13, 1876, under the new arrangement, the teams were employed in hauling supplies from the boat-landing to Tongue River. After that time they went to Fort Buford. There, under General Hazen, they continued in the employment of the government until January 24,1877.
All these services have been 2>aid for by the defendants— first, to the claimant for all the teams at $4.95 per day up to September 26, 1876, and for his own team after that date at $5 per day; second, to the several owners of the twenty-two teams for all their services after September 25, 1876, at $5 per day. In the opinion of the claimant these last payments were made in error. They should have been made, he thinks, only to himself. To enforce a repayment he brings this suit. In support of his position it is claimed that his contract did not expire until the teams, about February 7,1877, returned to Fort Lincoln. It will be observed that his contract was to furnish teams “ for transportation of military supplies accompanying the Yellowstone expedition en route from Fort Lincoln for fifty days or more.” No terminus of the route nor limit in time is given. The team-owners claimed that when the Army established posts along the Yellowstone and went into camp it was no longer en route. They did not agree, they insiste'd, unattended by troops to haul supplies from post to post. JSn route, on the way, as they understood it, meant while the troops were moving in pursuit of Indians or only temporarily encamped. In the opinion of the Court, the drivers were right. But suppose they were *91 wrong ; the defendants were not responsible for tlieir mistake. Both Lieutenant-Colonel Otis and Lieutenant Campbell urged them to continue under claimant’s contract, not because they considered it obligatory, but because it made a small saving to the government and because itwas easier to deal with one man than with twenty-two. It was the claimant who was in fault. He agreed “ to furnish teams, drivers, and wagons complete and in every respect ñt for the service.” Unwilling drivers, no more than balky horses, would fulfill that agreement. He was as much bound to furnish drivers who would drive as he was to furnish teams that could be driven. If there was a breach of contract it was for the defendants, not tlié claimant, to complain. They were put to additional trouble and expense. At that time claimant himself seemed to take this view' of the case; for while he complained of the teamsters, he thanked the government officers for inducing them to remain in the service twenty days longer than they had at first intended. He settled his contract to September 26, 1876, without protest, and after that date accepted pay for his own team at $5 per day without reservation.
But, it is said, the claimant is at least entitled to receive his profit on the return trip. Unloaded teams would travel from Glendive to Fort Lincoln, a distance of about two hundred miles, in ten days. If his contract terminated on the 5th day of September, he has already received the profit not only on ten, but on twenty additional days. For it was with this return trip in view, and the profit that the claimant might be entitled to receive thereon, that the teamsters were persuaded to continue work and allow him the profit, twenty days after their contract, as they understood it, had expired. It made no difference to claimant, provided he received his profit for ten additional days, whether the teams staid or returned. If, on the other hand, his contract with the government expired neither on the 5th nor the 25th day of September, and the obligation to furnish teams and drivers willing to work still rested upon him, as he most illogically insists, his utter failure to discharge that obligation precludes the consideration of future profits.
The claimant’s petition is therefore dismissed.